UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RAMIN EIVAZ,

                Plaintiff,

     v.                                      Case No.    12-C-910

MARK JONATHAN EDWARDS and
RED DOT SQUARE SOLUTIONS,

                Defendants.

---

## DECISION AND ORDER GRANTING
## DEFENDANTS' MOTIONS FOR SANCTIONS

---

Plaintiff Ramin Eivaz initiated this action for breach of contract, promissory estoppel, and unjust enrichment on September 6, 2012. Defendant Mark Jonathan Edwards is a UK resident who founded, owned, and operated Defendant Red Dot Square Solutions (Red Dot), a UK company specializing in creating computer-generated interactive retail worlds in virtual reality. Eivaz claims he is entitled under his professional services contract with Red Dot to 10% of purchase price that Edwards received when he sold Red Dot to a UK holding company. Adding in additional amounts for services he performed for Red Dot prior to the sale, Eivaz claims that Red Dot and/or Edwards owes him in excess of $1.1 million. Red Dot, under its new ownership, and Edwards deny that they breached any contract with Eivaz. Red Dot has also filed a counterclaim against Eivaz and a crossclaim against Edwards claiming that Eivaz conspired with Edwards in breach of the fiduciary duty Edwards owed Red Dot prior to his sale of the company. The case is presently before me on the defendants' motions for sanctions. For the reasons that follow, the motions will be granted.

# I. BACKGROUND

## A. Positions of the Parties

Eivaz and Edwards became acquaintances in or around 2003, and they remained in contact when Eivaz became a vice president at Kimberly-Clark Corporation. (Eivaz Dep. I at 109, ECF No. 51-10.) In June 2006, Kimberly-Clark entered into an "Exclusive Development Agreement" with Red Dot which provided that Red Dot would render services to Kimberly-Clark concerning the development of computer-generated interactive virtual spaces to assist in placement and marketing of consumer products. (ECF No. 59 at 3–21.) According to Edwards, Eivaz created the agreement between Kimberly-Clark and Red Dot under which Red Dot was to be paid up to $15 million dollars over a five-year period. (Supp. Decl. of Paul F. Corcoran, Ex. O, Dep. of Mark Jonathon Edwards at 26, ECF No. 66-1.) Eivaz was Edwards' main contact at Kimberly-Clark until Eivaz left and took position with Wachovia in or around November 2007.

Eivaz alleges that in October 2007, just before he left Kimberly-Clark, he entered into an agreement with Edwards to serve as a member of Red Dot's Advisory Council (the "AC Agreement"). Eivaz attached a letter of appointment to his complaint, which is signed by Edwards as the "Chairman and CEO" of Red Dot. (ECF No. 25-1.) The letter states that Eivaz was appointed to a three-year term commencing on November 1, 2007, and that his role was to (1) support Red Dot board leadership as they direct and supervise the management and affairs of Red Dot, (2) ensure that Red Dot was establishing and executing viable business strategies, (3) assist in the establishment of such policies, and (4) ensure that Red Dot understood and appropriately managed business risks. (*Id.* at 1.) As compensation, the letter states that Eivaz would receive $500,000 per year, payable on the last day of each year. In the event Red Dot was sold, Eivaz was

to receive "10% of the value of the sale of Red Dot Square Solutions or in the event of the Company not being sold will receive a sum equivalent to 20% of the turnover of the company in 2010, minus the sum of all payments made to date." (*Id.* at 2.) In his complaint Eivaz alleges that following his appointment, he served on the Advisory Council and "contributed his expertise and insights to management, including developing a marketing strategy for the company." (Am. Compl. ¶ 18, ECF No. 25.)

On February 4, 2009, Edwards effectively sold Red Dot to WPP Holding (UK) Ltd., an international marketing company, for an initial payment of £4,926,738.35, plus additional considerations. (ECF No. 25-2.) In April 2009, Edwards personally paid Eivaz £135,000 (approximately $189,000.00), which Eivaz characterizes in his complaint as a "partial payment" of his share of the sale proceeds Edwards received from WPP. (Am. Compl. ¶ 21, ECF No. 25.) On April 6, 2009, Eivaz sent Edwards an email proposing an agreement for payment of the balance Eivaz claimed he was owed over time. The email confirms that Eivaz had received $200,000.00 from Edwards "as relates to our previously signed agreement." (ECF No. 25-4.) Eivaz stated that the amount represented "a portion of the first payment, which is £492,674 (10% of initial payment made to Mark Edwards for £4,926,738.35)," and he suggested that there would be annual agreements to address the remaining balance from the first payment. (*Id.*) Eivaz also indicated that he waived any right to interest between the first and second payments, and he noted that he was entitled to additional payments based on Red Dot's future performance. (*Id.*) The same email chain also includes an email on the same day from Edwards to Eviaz in which Edwards noted that WPP had no knowledge of their agreement and that it was a private matter between him and Eivaz. (*Id.*) When no further payments were made, Eivaz filed this lawsuit against Edwards and Red Dot seeking

to recover the unpaid balance due on the purchase price, along with $583,333.33 in unpaid salary for services rendered to Red Dot during his 14-month tenure on the Advisory Council.

Red Dot denies any liability to Eivaz and has asserted a counterclaim against him and a cross claim against Edwards in which it alleges that the letter of appointment purportedly signed by Edwards on behalf of Red Dot was really a "sham" agreement intended to compensate Eivaz for helping Edwards renegotiate Red Dot's contract with Kimberly-Clark while Eivaz was still employed by Kimberly-Clark "in such a way that would provide additional value to Edwards in connection with Edwards' intended sale of Red Dot." (Red Dot Counterclaim and Crossclaim ¶ 7, ECF No. 28.) Red Dot denies that Eivaz performed any services for it as a member of its Advisory Council or that it even had an Advisory Council. (*Id.* ¶¶ 11, 12.) The undisclosed "sham" agreement Edwards entered into with Eivaz, Red Dot claims, exposed Red Dot to potential future liability from Eivaz, and constituted corporate waste." (*Id.* ¶ 29.) Red Dot claims that by entering the agreement with Eivaz, Edwards breached the fiduciary duty he owed Red Dot. Red Dot further claims that Eivaz aided and abetted Edwards' breach of his fiduciary duty, in part by enabling Edwards to retain the money allegedly owed to Eivaz, thereby exposing Red Dot to potential liability. (*Id.* ¶¶ 29, 36, 37.)

Edwards, for his part, denies the existence even of a "sham" agreement with Eivaz. (Edwards Answer, ECF No. 31.) As it appears from his deposition, Edwards does not dispute that he attempted to negotiate an agreement under which Eivaz would serve on an Advisory Council for Red Dot in October 2007 as Eivaz was leaving his position at Kimberly-Clark. Edwards contends, however, that the negotiations never resulted in a signed contract between the parties. Instead, Eivaz took a position with Wachovia when he left Kimberly-Clark, and the anticipated Advisory Council was never formed. Edwards also contends that the letter of appointment was accompanied

by proposed contract, as well as tax forms, that were to be completed and signed if Eivaz decided to accept his offer. Edwards contends that because Eivaz never signed and returned the additional documentation and contract, no contract was created. More ominously, Edwards contends that the terms of the letter of appointment were altered. He denies that Eivaz was ever offered a salary of $500,000 per year and points to the proposed contract that was sent to Eivaz in which the proposed salary was only $4,000 per month or $48,000 per year. Edwards also denies that he ever offered 20% of the turnover of the company. (Supp. Corcorran Decl., Ex. O, Edwards Dep. at 44–56, ECF No. 66-1; Decl. of Paul F. Corcorran, Exs. L, M, ECF Nos. 51-12, 51-13.)

**B. Discovery**

Given the disparate positions of the parties over the facts of the case, discovery was crucial. The initial deadline set for fact discovery in this matter was November 30, 2013. (ECF No. 26.) On or around May 14, 2013, Red Dot sent Eivaz its first set of requests for production of documents. (ECF No. 39-3.) In the May 14 document requests, Red Dot specifically requested that Eivaz produce communications "between Eivaz and Edwards" (Request No. 1), documents "concerning, reflecting, or evidencing any service(s) that Eivaz provided to Red Dot, including, but not limited to, any services provided as part of Eivaz's alleged role as a member of the alleged Red Dot Advisory Council" (Request No. 3), and documents "concerning and/or reflecting amounts owed, or not owed, to Eivaz by Red Dot pursuant to the [AC Agreement] and/or any other agreement, including, but not limited to, all tax filings, loan documents (including documents submitted to banks or brokers in order to obtain a mortgage or refinance an existing mortgage)" (Request No. 9). (*Id.*)

On October 31, 2013, Red Dot filed a motion to compel, asserting that Eivaz's document production was deficient in numerous respects. (ECF No. 38.) More specifically, Red Dot noted

that Eivaz had provided a mere 31 pages of documents, consisting of a one-page letter, a one-page newspaper article, and nine email chains, in response to its request for production in a case in which he was demanding over $1.1 million in damages under a professional services contract. Eivaz had later supplemented his response with four years of his tax returns and a one-page summary of his phone/text message records showing that he had sent a total of 432 text messages and made 68 telephone calls to Edwards, averaging less than nine minutes per call, between November of 2007 and April of 2009. No actual text messages or summaries of the calls was included. Eivaz claimed he was unable to produce emails and other information stored on his computer because he had suffered two separate computer crashes in 2008 and 2009. Red Dot noted, however, that Eivaz had failed to produce the computers he claimed had crashed to allow Red Dot to examine them, and it questioned whether Eivaz nevertheless could obtain copies of his emails from his server. Red Dot also complained that Eivaz had failed to provide the financial statements and loan documents it had requested. In response to Red Dot's motion, Eivaz submitted an affidavit attesting that he had "performed an exhaustive search for all e-mails, financial statements and loan documents requested in Defendant Red Dot Solutions' Requests for Production of Documents." (Aff. of Ramin Eivaz ¶ 2, ECF No. 44-7.)

Given the absence of supporting documentation for his claim that he had provided services to Red Dot under the alleged professional services agreement and its difficulties in arranging his deposition, Red Dot also filed a motion to conduct an extended deposition of Eivaz, seeking to increase the time allotted under Fed. R. Civ. P. 30(d)(1) from 7 hours to 14 hours. (ECF No. 40.) Red Dot argued that it needed additional time to inquire into Eivaz's involvement with Edwards while employed at Kimberly-Clark, the circumstances surrounding the formation of his alleged

contract with Red Dot, his work for Red Dot under the alleged contract, the multiple crashes of his computers and loss of electronically stored information, and his communications with Edwards leading up to and after the sale of the company. Rather than incurring the additional expenses that would be required to reconvene a continuation of the deposition at a later time, Red Dot asked the Court to authorize it to exceed the presumptive limit of seven hours.

The court held a telephone hearing to address the motions on November 21, 2013. (11/21/13 Tr., ECF No. 51-7.) Eivaz argued that he had substantially complied with his discovery obligations: "All I can tell you is we have complied with our duties under the initial disclosures, under the discovery requests, and we've provided all of the e-mails and all of the documents that we currently have." (*Id.* at 19.) Eivaz argued that he could not produce e-mails that had been lost, and even if the defendants needed the e-mails, they already had access to the e-mails by virtue of being the email recipients. (*Id.* at 20.) Red Dot asserted that the majority of Eivaz and Edwards' communications were done via personal email addresses, and Edwards had not produced any e-mails from his personal accounts. (*Id.* at 23.) As for the financial records, Eivaz admitted that he was involved in "many, many transactions" but failed to explain why he had not produced the records of those transactions earlier. His attorney assured the court he would search for and produce "whatever he's able to find." (*Id.* at 21.)

The court directed Eivaz "to produce and use his best efforts to produce all documents and e-mails and text messages that are within his control or in his possession," including the financial records. (*Id.* at 26.) Specifically as to the financial records, the court noted there was no dispute

they are relevant and they should have been produced already. (*Id.* at 26–27.) The court ordered Eivaz to comply within ten days. With respect to the extended deposition, the court issued the following ruling:

> I'll allow an extended deposition with this understanding: There'll be no wasting of time. . . . And [Eivaz's counsel], if you believe that [Red Dot's counsel] is abusing this, call me on the telephone. I take in-deposition calls if there's a problem. If he's abusing his opportunity to question your client, or if he's harassing your client, I will terminate the deposition or take other action.

(*Id.* at 27–28.) At the conclusion of the hearing, Eivaz's counsel noted that he was free after the call to schedule Eivaz's deposition. He stated that "[w]e'll have to schedule it for two days based on the Judge's ruling here today, which I think we can do." (*Id.* at 34.)

The parties subsequently scheduled the deposition for December 16 and 17 in Green Bay, Wisconsin. On December 16, Red Dot's counsel began to examine Eivaz at 10:07 a.m. and temporarily concluded at 12:32 p.m. for a lunch break. (Eivaz Dep. I at 6, 105, ECF No. 51-10.) He then continued from 1:39 p.m. until 4:34 p.m. (*Id.* at 105, 218.) Edwards' counsel, who was not able to be there the next day, then examined Eivaz from 4:51 p.m. until the parties concluded the day at 5:57 p.m. (*Id.* at 218, 285.) The following day, Red Dot's attorney began to examine Eivaz at approximately 9:00 a.m. At approximately 11:00 a.m., after Red Dot's counsel had examined Eivaz for a total of about seven hours, Eivaz's counsel interrupted the examination to ask Eivaz what time he had to leave. (Eivaz Dep. II at 76:9-10, ECF No. 51–11.) Eivaz replied, "Probably elevenish. It's already past." (*Id.* at 76:11–12.) Red Dot's counsel stated that the deposition would not be done by 11:00 "by any stretch of the imagination," to which Eivaz's counsel replied, "It's past eleven right now. He has a flight to catch." (*Id.* at 76:13–16.) Red Dot's counsel then objected to Eivaz leaving the deposition at that time, noting that he had deposed Eivaz for only 35 minutes over

seven hours. (*Id.* at 76:20–21). He argued that 35 extra minutes was not an "extended deposition" and since Eivaz was not working at the time, there was no reason for him to have booked his flight for 12:00 p.m. (*Id.* at 77:16–22.) Eivaz's counsel argued that the Judge ordered an extended deposition "as long as you weren't wasting time." (*Id.* at 77:4–5.) He then stated, "It's been an extended deposition. He has a plane to catch. I don't know what else to tell you." (*Id.* at 77:5–7.) After explaining that Eivaz would not arrive in Jacksonville, Florida until 10:00 p.m. even if he left at noon, Eivaz's counsel stated, "I am going to allow him to leave. If you want to call the court, call the court." (*Id.* at 78:21–22.) Counsel for Eivaz and Red Dot then argued as to whether Red Dot's questions were relevant or merely "verbatim readings" of e-mails. (*Id.* at 78:23–79:11.)

Red Dot's counsel ultimately took the position that it was Eivaz's responsibility to call the court if he wished to terminate the deposition. (*Id.* at 80:1–4.) Eivaz's counsel replied, "I'll call the court right now," but then instructed Eivaz, "You can leave." (*Id.* at 80:5–8.) The parties took a short break before Eivaz's counsel contacted the court. Counsel for each party stated their positions on the telephone, but since Eivaz had already left to catch his flight, the court noted it was too late for its ruling to make a difference and that the parties would have to resolve the dispute through motion practice. (*Id.* at 87:7–88:7.)

On January 13, 2014, Red Dot filed a motion for sanctions against Eivaz and his counsel pursuant to Fed. R. Civ. P. 37(b)(2) for their "egregious violations" of the Federal Rules of Civil Procedure and discovery orders. (ECF No. 49.) Red Dot asks the court to (1) dismiss Eivaz's claims with prejudice; (2) award monetary sanctions to cover the expenses Red Dot incurred in preparing for and taking an aborted deposition; (3) award monetary sanctions in the amount of costs Red Dot incurred in bringing this motion; (4) award monetary sanctions in the amount of costs Red

Dot incurred in seeking the November 21, 2013 compulsion order; and (5) alternatively, if Eivaz's claims are not dismissed, issue an order precluding Eivaz from testifying or offering evidence at trial in support of his claim for $1,165,666.666 in compensation for the alleged professional services rendered. (*Id.*) Edwards filed a conjoined motion to dismiss on January 30, 2014, in which he indicated that he joins Red Dot's argument insofar as the motion seeks to sanction Eivaz, but not insofar as it seeks to sanction Eivaz's counsel. (ECF No. 54.)

In support of its motion, Red Dot argues that Eivaz has engaged in a pattern of sanctionable conduct, in that he (1) failed to produce responsive documents requested by Red Dot pursuant to Rule 26; (2) submitted false and perjured statements to Red Dot and this court regarding Eivaz's discovery efforts and the availability of documents; (3) failed to produce documents in violation of this court's November 21, 2013 compulsion order; (4) violated this court's November 21, 2013 compulsion order by unilaterally terminating, without good faith basis, the extended deposition of Eivaz; and (5) frustrated Red Dot's efforts to obtain fact discovery from Eivaz by appearing for his deposition without adequate preparation. (ECF No. 50.)

## II. ANALYSIS

### A. Preliminary Matters

Two preliminary matters merit attention. First, contrary to Eivaz's assertions, Red Dot was not required to hold a meet-and-confer session with Eivaz prior to filing its motion. Civil L.R. 37 requires parties to meet and confer before filing "motions to compel disclosure or discovery," but this requirement does not extend to motions for sanctions. *See Lindstedt v. City of Granby*, 238 F.3d 933, 936 (8th Cir. 2000) ("Rule 37 . . . does not require any meet-and-confer requirement as

a predicate to seeking sanctions."). Since a motion to compel seeks compliance with the discovery rules, a meet-and-confer session may obviate the need for motion practice. Once such a motion has been filed, however, and the court has entered an order granting the motion, it makes no sense to order the parties to meet and confer. That was already tried. In such situations, the harm has already been done; there is little left for the parties to "work out" at a meet-and-confer session. The fact that Red Dot did not hold a meet-and-confer session with Eivaz before filing this motion thus does not make Red Dot's motion premature.

Eivaz also filed a letter requesting a telephone conference to further discuss the matters addressed in the parties' briefs. (ECF No. 71.) The court concludes that the briefs and numerous exhibits submitted by the parties provide ample information upon which to decide this motion. *See Langley by Langley v. Union Elec. Co.*, 107 F.3d 510, 515–16 (7th Cir. 1997) (explaining that "Rule 37 requires no evidentiary hearing," and that no hearing is warranted "where the briefs and affidavits fully recount the circumstances surrounding the noncompliance with the court's order."). The defendants' motions are therefore ripe for decision.

## B. Sanctionable Conduct

Federal district courts have the inherent power to sanction litigants for bad-faith conduct. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). Federal Rule of Civil Procedure 37(b)(2) also authorizes district courts to impose sanctions for a party's failure to obey discovery orders. The Supreme Court has stated that "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be

11

tempted to such conduct in the absence of such a deterrent.'" *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 763–64 (1980) (quoting *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)).

The Seventh Circuit has identified two different standards for determining whether a case can be dismissed as a sanction. When the sanction is under Fed. R. Civ. P. 41(b) for want of prosecution or failure to comply with orders of the court, a case can be dismissed only when there is a "clear record of delay or contumacious conduct, or prior failed sanctions." *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003). "A slightly different requirement—a finding of willfulness, bad faith or fault—comes into play when dismissals are used specifically as a discovery sanction under Fed.R.Civ.P. 37." *Id.; see also Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009). "Willfulness" and "bad faith" are characterized by intentional or reckless disregard of a party's obligations to comply with a court order. *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000); *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992). "Fault" refers not to the non-complying party's subjective motivation, but to the lack of reasonableness which eventually culminated in the violation. *Langley by Langley v. Union Elec. Co.*, 107 F.3d 510, 514 (7th Cir. 1997) (quotation omitted).

Under *Maynard v. Nygren*, to impose the sanction of dismissal the court must find willfulness, bad faith, or fault by "clear and convincing evidence." *Maynard v. Nygren,* 332 F.3d 462, 467–68 (7th Cir. 2003). Although subsequent cases have questioned this heightened standard, none have overruled *Maynard. See Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Servs. Americas LLC,* 516 F.3d 623, 625–26 (7th Cir. 2008); *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559,

564 (7th Cir. 2007). Any sanction imposed must be proportionate to the circumstances surrounding the party's failure to comply with discovery. *Langley by Langley*, 107 F.3d at 514 (citations omitted).

In deciding whether there exist grounds for imposing a sanction in this case, I will examine whether Eivaz violated his discovery obligations and this court's orders, and if so, whether any such violation demonstrates willfulness, bad faith, or fault. In conducting its analysis, the court will consider the conduct of Eivaz and his counsel. *See United States v. Di Mucci*, 879 F.2d 1488, 1496 (7th Cir. 1989) ("[T]he law in this circuit is that an attorney's conduct must be imputed to his client in *any* context."). When a court determines that grounds for a Rule 37 sanction exist, instead of or in addition to whatever other sanction it imposes, the court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) and (d)(3).

### 1. Production of E-mails

Red Dot contends Eivaz has failed to offer a satisfactory explanation for his failure to produce e-mails from his personal account. Eivaz cannot be sanctioned for failing to produce e-mails that he does not have, however, assuming that he did not take deliberate steps to destroy them so as to avoid disclosure. *See Domanus v. Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014) (observing that a party cannot be sanctioned for failure to comply with discovery orders if compliance was impossible). To establish the impossibility of compliance, however, Eivaz "must have made diligent efforts." *Id.* (citing *United States v. Conces*, 507 F.3d 1028, 1043 (6th Cir. 2007) (party must show "categorically and in detail" that it took all reasonable steps within its power to comply with the

court's order) (internal quotation and citations omitted)).  At his deposition, Eivaz testified that he

spent days searching his hard drive and paper files for responsive e-mails.  (Eivaz Dep. I at 58:12–23,

ECF No. 51-10.)  Ordinarily, this would constitute "diligent efforts."  Red Dot contends, however,

that Eivaz's explanation for his minimal e-mail production is a baseless fabrication.  Its argument is

not unfounded.

Eivaz's explanation for failing to produce more than a handful of e-mails from his personal

account is that he had computer crashes in 2008 and 2009 which destroyed two of his computers,

including e-mails sent and received prior to the crashes.  Eivaz utilized (and apparently still utilizes)

the domain name "Eivaz.com" and the e-mail address "ramin@eivaz.com," which he obtained

through ReadyHosting.com.  When asked whether his pre-crash e-mails would be stored by

ReadyHosting, Eivaz testified that ReadyHosting only stored his e-mails for "up to 30 days."  (Eivaz

Dep. I at 52:12, ECF No. 51-10.)  He testified that he had purchased the basic service, which costs

about $100 per month.  (*Id.* at 52:18–25.)

Red Dot first points to ReadyHosting's express policies, which Red Dot found on the

company's website on January 12, 2014.  ("Maintaining Your Mailboxes," ECF No. 52-1.)  The

webpage printout states that "ReadyHosting hosting accounts include an unlimited number of

mailboxes.  However, each individual mailbox has a storage capacity of 250MB or 10,000 e-mails,

whichever comes first."  Red Dot's counsel also personally signed up for ReadyHosting's $100

annual website and e-mail hosting plan, and counsel attests that consistent with the printout, he was

given an account with the capacity to store up to 10,000 e-mails or 250MB of information.  (Decl.

of Andrew C. Keisner ¶ 3, ECF No. 52.)  Counsel also attests that he contacted ReadyHosting's

technical support staff, and a ReadyHosting representative informed him that Ready Hosting does

not, nor has it ever, offered any type of "auto purge" feature that would delete e-mails automatically from the server after a certain period of time. (*Id.* ¶ 4.)

Second, Red Dot points to the dates printed on two of the e-mails Eivaz produced. Eivaz testified that in his search for responsive documents, he found two e-mails from October 2007 between him and Edwards that he possessed in hard copy because he had previously printed them. (*See* e-mails labeled EIVAZ 00030 and 00031, ECF No. 51-3; Eivaz Dep. I at 67:9–10, ECF No. 51-10.) He indicated he knew he had printed the documents because his printer added a red line down the left-hand side of the page. (*Id.* at 67: 10–12.) In the lower left-hand corner of 00030 and 00031 appears the date "1/15/2012." Red Dot asserts that this is the date the documents were printed, which would contradict Eivaz's testimony that he lost all 2007 e-mails in the 2008 and 2009 computer crashes.

In response, Eivaz argues that his testimony is not inconsistent with ReadyHosting's services. He notes that on the webpage printed by Red Dot's counsel, ReadyHosting indicates that it has a setting enabling users to download and archive their e-mails to a program like Microsoft Outlook. (ECF No. 52-1.) The webpage further explains that a user may adjust his e-mail settings to delete messages from the ReadyHosting server after they are downloaded to a program like Microsoft Outlook. (*Id.*) Eivaz attests that he uses Microsoft Outlook to manage his e-mail account, although he is not familiar with what his settings may have been over the years. (Aff. of Ramin Eivaz ¶ 19, ECF No. 58.) He also attests that Microsoft Outlook would enable a user to archive or delete e-mails after 30 days, and that due to space limitations, he did have some sort of archiving setting in place with Microsoft Outlook. (*Id.*) He thus contends that his version of events is perfectly plausible. As for the dates on e-mails 00030 and 00031, Eivaz argues that Red Dot's contentions

15

are pure speculation. He testified that he does not know how or when the dates were added to the documents. (Eivaz Dep. I at 68:20–69:8.) He suggests that his counsel's law firm in Florida might have stamped the date on the documents. Eivaz also notes that there is nothing spectacular about his failure to retain old e-mails, given that he is an individual and not a corporation with a document retention policy. Finally, he proposes that if Red Dot wishes to pursue the matter further, he will provide an authorization to try and obtain his personal e-mails from ReadyHosting.

In reply, Red Dot argues that since Eivaz can only speculate as to what his Microsoft Outlook and ReadyHosting settings actually were, he has failed to meet his burden to demonstrate impossibility. Red Dot also rejects Eivaz's argument that his Florida counsel may have stamped the date on the documents, noting that other emails Eivaz produced (EIVAZ 00024 - EIVAZ 00029) bear 2009 dates in the same location on the document and in the same font. (ECF No. 51-3 at 25 - 30.) Red Dot points out that based on Eivaz's testimony, it appears that he was not contemplating legal action against Edwards until he finally filed a complaint in 2012. (Eivaz Dep. I at 274:5–276:17, ECF No. 51-10.) The only reasonable explanation, Red Dot contends, is that Eivaz's printer was programed to include the date on documents it printed, and Eivaz's contention that he lost all of his emails in earlier computer crashes is a fabrication.

As noted, Red Dot's argument is not unfounded. Eivaz has a degree in computer science and early in his career developed computer systems and software for the business where he worked. (*Id.* at 12:5-9.) He describes himself as "a seasoned marketing professional having spent his professional working career in the marketing division and departments of several multi-national companies" (Am. Compl. ¶ 8, ECF No. 25.) In his 25 plus year marketing career, Eivaz states he "specialized in developing and managing market intelligence, with a focus on shopper insight, consumer targeting

and market/consumer research." (*Id.* ¶ 9.) Given his background and experience, it seems unlikely that he would take no steps to preserve and store a record of the work he performed and for which he claims he was promised a salary of $500,000 per year.

Notwithstanding the force of Red Dot's argument, however, the court is reluctant to conclude on the evidence before it that Eivaz has lied. It is not physically impossible that Eivaz suffered two computer crashes. He may also have decided to dispose of the computers after the crash without intending to destroy evidence. Absent additional evidence, I do not find that Eivaz intentionally withheld or destroyed evidence. Red Dot's counsel has suggested a plausible theory as to the source of the printed dates on documents 00030 and 00031, but Red Dot's counsel is not an expert in computer forensics. *Cf. Krumwiede v. Brighton Associates, L.L.C.*, No. 05–C–3003, 2006 WL 1308629, at *6, 9–11 (N.D. Ill. May 8, 2006) (concluding that default judgment was appropriate sanction against defendant on basis of expert report which indicated that defendant had deleted relevant computer files). The October 2007 emails Red Dot references may have been printed on Eivaz's computer in 2012, or there may be some other explanation that is not apparent to a layperson or this court. Inconsistencies within the e-mails complicate the analysis. Absent expert analysis, the printed dates do not constitute "clear and convincing" evidence that Eivaz had access to historic e-mails but willfully withheld them from Red Dot.

Red Dot has also failed to demonstrate by clear and convincing evidence that Eivaz is dissembling with regard to the services he purchased from ReadyHosting. Red Dot's affidavit demonstrates only that ReadyHosting does not automatically delete a user's e-mails after a 30-day period of time. It does not foreclose the possibility that in 2007, Eivaz utilized Outlook and archived his e-mails on his computer rather than on the ReadyHosting server, as he contends he may have

done. The affidavit also contains no attestation from a representative of Ready Hosting that Eivaz's historic e-mails are stored on ReadyHosting's server and accessible to Eivaz. Red Dot has thus failed to demonstrate that Eivaz's computer crash stories are fabrications.

In sum, Eivaz claims he does not have access to historic e-mails, and since Red Dot has failed to prove otherwise by clear and convincing evidence, Eivaz's minimal e-mail production does not warrant sanctions. Notably, if Red Dot is correct that Eivaz's e-mails remain on ReadyHosting's server, Red Dot should be able to access those e-mails, assuming it cannot get the e-mails directly from Edwards. Eivaz has offered to cooperate in that effort, and Red Dot or Edwards may wish to take him up on his offer. The defendants may also elect to retain an expert to investigate the issue. The allegations are, of course, serious, and if Eivaz has intentionally withheld or destroyed relevant evidence and lied about it under oath to counsel and the court, sanctions beyond dismissal would be warranted.

### 2. Production of Financial Records

Red Dot contends that Eivaz violated the court's November 21, 2013 order by failing to produce mortgage loan applications and accompanying financial disclosures responsive to Document Request No. 9, which asks for documents "reflecting amounts owed, or not owed, to Eivaz by Red Dot . . . including, but not limited to, all tax filings, loan documents (including documents submitted to banks or brokers in order to obtain a mortgage or refinance an existing mortgage." (ECF No. 39-3.) Eivaz did not state any objection to this document request in his response to Red Dot's first set of requests for document production. (ECF No. 41-2 at 6.) In Red Dot's motion to compel, Red Dot identified two Tampa, Florida properties that appeared on Eivaz's tax returns: Condo – Printery and Condo – B. Daniel, properties that were apparently acquired in 2008 and 2009. (Cross-motion

¶ 16, ECF No. 38.) But these were mentioned only as evidence that Eivaz had not complied with Red Dot's request, not as a limitation upon that request. Red Dot was clearly seeking copies of any documents in which Eivaz would have been required or at least expected to disclose a complete listing of his income and assets.

At the November 21, 2013 telephone hearing, the court directed Eivaz "to produce and use his best efforts to produce all documents and e-mails and text messages that are within his control or in his possession," including the financial records. (11/21/13 Tr. at 26, ECF No. 51-7.) Following the court's order, Eivaz produced only financial records related to the two transactions Red Dot referenced in its cross-motion to compel. The parties agree that these documents are irrelevant because one transaction actually occurred in April 2007 and pre-dated Eivaz's and Edwards alleged agreement and the other was a 2009 "all cash" transaction. (ECF No. 51-9.)

Following Eivaz's production of the Tampa condo documents, Red Dot conducted additional research and discovered that Eivaz had in fact financed the purchase of other real estate through financial institutions between 2007 and 2009, and that he refinanced the mortgages on those properties between 2008 and 2011. When confronted about these transactions at his deposition, Eivaz acknowledged he possessed documents related to the transactions which he did not produce. (Eivaz Dep I at 83:23–84:1, ECF No. 51-10.) He also acknowledged that he did not list any income from Red Dot (he had none) or include his contract with Red Dot as an asset. (*Id.* at 96.) Eivaz testified that he thought his production was sufficient because his attorney had only directed him to produce documents for the Tampa condo transactions and for transactions in which he referenced a Red Dot asset. (*Id.* at 80:19–81:6.) Eivaz produced the Tampa condo documents, and he asserts that he never listed Red Dot's alleged debt as an asset on a mortgage application. (*Id.* at 80:19–24.)

Red Dot contends that Eivaz's deposition testimony amounts to an admission on his part that his November 21 affidavit was false. Eivaz testified at his deposition that although he initially conducted an "exhaustive" search for e-mails, he did not conduct an exhaustive search for loan documents. (*Id.* at 78:19–79:10.) As Red Dot observes, this admission contradicts his November 21, 2013 affidavit, in which he attested that he had "performed an exhaustive search for all e-mails, financial statements and loan documents requested in Defendant Red Dot Solutions' Requests for Production of Documents." (Aff. of Ramin Eivaz ¶ 2, ECF No. 44-7.) Eivaz also testified that he "didn't know how to search loan documents," and so even after the court issued its November 21 rulings, he did not search for any documents related to transactions apart from the Tampa condo transactions. (*Id.* at 79:3–10.)

It is true that Red Dot's Document Request No. 9 is somewhat confusing. The request directed Eivaz to produce loan documents, including mortgage documents, that "reflect amounts owed, or not owed, to Eivaz by Red Dot." (ECF No. 39-3.) He suggests that it is not entirely clear what it means for a document to reflect an amount "not owed" to Eivaz by Red Dot. But whatever confusion he may have had initially was cleared up by Red Dot on several occasions. On September 19, 2013, Red Dot sent Eivaz a deficiency letter explaining that "documents that include *or omit* prior payments and/or future income from Red Dot or Edwards on documents where Eivaz represented his income and/or assets to any third party goes (sic) to the heart of Eivaz's claims and Red Dot's defenses." (Sept. 19 Letter, ECF No. 51-4 at 40.) (emphasis added). Red Dot demanded that Eivaz "produce all loan documents and cooperative/home association documents that mention or reference Eivaz's salary and/or assets." (*Id.*) Red Dot again clarified at the November 21, 2013 telephone conference that it wanted loan documents whether Eivaz had recorded *or omitted* Red

Dot's alleged debt in his list of assets. As Red Dot explained, Eivaz's failure to record the alleged debt as an asset constitutes relevant evidence under its theory of the case because it suggests that he did not expect to receive the money. (11/21/13 Tr. 16, ECF No. 51-7.) Eivaz did not object to the relevancy of such documents at the hearing, and instead he assured the court that "whatever he's able to find, he will produce." (*Id.* at 21.) Thus, following the September 19 deficiency letter and the November 21 hearing, Eivaz should have understood that his mortgage documents from 2008-2011 were responsive to Red Dot's document request. Eivaz has since produced the documents and, as Eivaz testified, he did not list income from Red Dot or any interest in Red Dot on his disclosures. Eivaz testified that Edwards asked to delay payment of his salary because of other expenses, so there was no income from Red Dot to report, and he never knew when or whether Red Dot would be sold so it was never listed as an asset. Still, Red Dot was entitled to the documents and Eivaz's failure to provide them within the time ordered by the court constitutes a violation of the court's order. In addition, his November 21 affidavit reflects if not outright dishonesty a reckless disregard for the truth.

### 3. Production of Other Documents

Red Dot also contends that Eivaz admitted to withholding other responsive documents during the discovery process. Eivaz stated that in a folder at his home in Florida, he had a signed copy of the business contract between Kimberly-Clark and Red Dot, as well as documents showing Eivaz authorizing Edwards to work on various projects. (Eivaz Dep I at 140:21, 222:11–16.) Red Dot argues that those documents are clearly responsive to Document Requests 1 and 2, which ask for "All Documents and Communications between Eivaz and Edwards," and "All documents or Communications concerning Red Dot or Edwards." (ECF No. 39-3.)

The nature of Eivaz and Edwards' business relationship during the period in which Eivaz was employed by Kimberly-Clark is at issue in this lawsuit. In Red Dot's Cross-claim and Counterclaim, Red Dot alleges that "[u]pon information and belief, Edwards and Eivaz conspired to renegotiate an agreement between their companies in such a way that would provide additional value to Edwards in connection with Edwards' intended sale of Red Dot. In return, Edwards conspired with Eivaz to allow Eivaz to share in that additional value." (Red Dot's Cross-claim and Countercl. ¶ 7, ECF No. 28.) The documents are therefore relevant to Red Dot's counterclaim against Eivaz. But Eivaz objected to Red Dot's Document Requests 1 and 2 as being overly broad, and Red Dot made no effort to narrow its request in subsequent correspondence. Red Dot is not entitled to all communications between Eivaz, Edwards or Red Dot; it must tailor its discovery requests to help Eivaz determine which documents and communications are relevant and which are not. Thus, although the documents at issue are relevant in relation to Red Dot's counterclaim and Red Dot was ultimately entitled to receive them (which it has), the court declines to hold that Eivaz's initial failure to produce them violated a discovery order.

### 4. Aborted Deposition

Finally, Red Dot asserts that Eivaz knowingly violated the court's November 21, 2013 order granting an extended deposition by purchasing a flight scheduled to leave at noon on December 17 and then by leaving at 11:00 a.m. to catch his flight before the deposition was concluded. The parties have some disputes about the conversations that took place between Red Dot's counsel and Eivaz's counsel off the record, but for the most part the facts are clear. Eivaz contends that his counsel approached Red Dot's counsel during the lunch break on December 16 and offered to continue until midnight on the 16th because Eivaz had an earlier flight on the 17th. Eivaz asserts that the offer was

refused. Red Dot acknowledges that Eivaz's counsel advised counsel for Red Dot that Eivaz had a noon flight on December 17, but denies that it was mentioned in connection with an offer to work late into the night on December 16. When told of Eivaz's noon flight reservation, counsel for Red Dot simply said he would not be able to complete the deposition by then and no more was said about it until the next day when Eivaz simply left. Red Dot further contends that continuing until midnight on the 16th was impossible in any event because Eivaz's counsel had to travel from Green Bay to Milwaukee immediately after the deposition concluded at 6:00 p.m. to tend to flood damage in his condominium.

The record supports Red Dot's version of events. The failure of Eivaz's attorney to respond to Red Dot's attorney's statement that the deposition would not be completed by noon the following day was reasonably interpreted by Red Dot's attorney as acquiescence by counsel for Eivaz and the expectation that Eivaz would be changing his travel plans. This conclusion is further supported by the reaction of Red Dot's attorney when Eivaz's attorney simply announced at about 11:00 a.m. that his client was leaving. Had counsel for Eivaz made clear that his client was leaving at 11:00 a.m. the following day, a telephone call to the court would have been made long before Eivaz had gotten into his car and left for the airport. By saying nothing until his client was about to leave, counsel for Eivaz deprived Red Dot's attorney of the opportunity to get relief from the court to avoid the interruption.

Regardless of whether it would have been reasonable or even possible to continue on the evening of the 16th, however, Eivaz should not have scheduled such an early flight on the 17th. Red Dot's attorney had no obligation to continue the deposition until midnight just so Eivaz could make an early flight. He had requested an extended deposition for up to 14 hours, and the court granted

23

the request. (ECF Nos. 40 & 45.) Eivaz's attorney had acknowledged at the end of the November 21 hearing that they would have to set aside two days for the deposition. The fact that Eivaz was not working at the time and has offered no explanation as to why he scheduled a return flight that failed to accommodate the extended deposition the court expressly authorized suggests that his intent from the beginning was to thwart Red Dot's effort to uncover the facts surrounding what on this record appears a highly suspicious claim. Eivaz disingenuously suggests that he complied with the court's order by booking his flight "from Jacksonville, Florida to Green Bay to arrive on December 15, 2013 and a return flight on December 17, 2013." (Aff. of Ramin Eivaz ¶ 12, ECF No. 58.) But because the deposition was scheduled to commence on December 16, the fact that Eivaz arrived on December 15 is irrelevant. The plain fact is that he willfully violated the court's clear order.

It is also clear that Eivaz's decision to terminate the deposition was entirely unjustified. At the November 21, 2013 telephone hearing, the court instructed the parties that although it was allowing the extended deposition Red Dot had requested, Red Dot's attorney was not to abuse the opportunity he was provided and that Eivaz could terminate the deposition if counsel for Red Dot was wasting time or harassing Eivaz. The court also noted that when it was able to do so, it took telephone calls during depositions to rule on objections and other disputes that arose so as to avoid delay and further motion practice. The court offered to rule on such an issue in this case if counsel for Eivaz felt that Red Dot was abusing his client. Counsel for Eivaz did not avail himself of the court's offer. Instead, he advised Eivaz he could leave, walked him out to the car so he could catch his flight, and then returned to the deposition at which time a call was placed to the court. By that time, of course, it was too late for the court's ruling to make any difference.

24

Although counsel for Eivaz claims that Red Dot was wasting time, it is clear that this is not why counsel advised Eivaz he could leave. Given his airline reservation, it is clear that Eivaz had no intention of remaining for the completion of his deposition. In addition, after reviewing the deposition transcript in its entirety, the court concludes that Red Dot's counsel was not wasting time. Eivaz mischaracterizes the deposition testimony when he asserts that Red Dot's counsel was simply reading verbatim from e-mails and asking Eivaz to confirm that they were read correctly. This lawsuit primarily concerns events that took place between 2006 and 2009, and Eivaz denied specific recall of many of the events he was asked about. Counsel for Red Dot reasonably attempted to refresh Eivaz's recollection with documents so that he could provide details about his relationship with Edwards and Red Dot while he worked for Kimberly-Clark. Many of the documents were read as foundation for additional questions.

Moreover, notwithstanding Eivaz's attorney's current argument in opposition to Red Dot's motion for sanctions that its attorney was wasting time, he has failed to point to any place in the record where an objection was posed to counsel's questioning on that basis. The court's own review reveals no objections posed by Eivaz's attorney on the ground the attorney for Red Dot was abusive or wasting time. In fact, if anyone was wasting time, it was Eivaz with his evasive, argumentative and non-responsive answers to many of the questions posed to him.

By way of illustration, more than 25 pages of the transcript are taken up by the effort by counsel for Edwards to find out from Eivaz why he failed to report as income the approximately $180,000 payment Edwards made to him on his 2009 tax return, or his return for any year thereafter, and what he told his accountant about it. (*Id.* at 241–68.) Throughout the discussion, Eivaz offered various explanations, including he and his accountant did not know how to treat it, he was waiting

25

for word from Edwards on what the total would be, he needed to know if Edwards had paid taxes on the money, and Edwards wanted to keep the payment confidential so he treated as a loan.  (*Id.* at 247, 248–49, 251–52, 260, 262.)  Eivaz's shifting and confusing explanations, not the conduct of counsel was the reason it took so long to cover a relatively narrow question.

Likewise, counsel could not get a straightforward answer from Eivaz to his simple question: "Is there any individual you can name, as you sit there now, to confirm that you actually did anything to earn the money you're suing for?" (*Id.* at 278:16–18.) Six pages later, after mentioning the need to check various emails, a meeting in New York with a Kimberly-Clark executive and his wife, a discussion of the meaning of the word "earn" and his contributions to Edwards' success ("If it wasn't for me, and I think [Edwards] stated that as well, Red Dot would not have been born, or sold, for the price it was sold." (*Id.* at 279:21-24)), Eivaz names one other Kimberly-Clark employee.  (*Id.* at 278–285.)  The same evasive and non-responsive tactics continued the following day.

Eivaz also appears to take the position that the work he performed at Kimberly-Clark on a day-to-day basis is irrelevant to this lawsuit, but clearly it is directly relevant to Red Dot's claim that his contract with Edwards was for the assistance he provided Edwards while still an employee of Kimberly-Clark.  Red Dot's questioning was reasonably designed to elicit testimony about Eivaz's extensive contributions to Red Dot before he left Kimberly-Clark, in contrast to the absence of any contribution by him after he left.  Red Dot's counsel asked questions about particular e-mails, meetings, and presentations to accomplish this goal, and while Eivaz chided Red Dot's counsel by asking when the "Perry Mason moment" would happen, counsel was not required to explain his legal arguments to Eivaz during the deposition.  (Eivaz Dep. I at 173:14–16, ECF No. 51-10.)

In sum, Eivaz has failed to identify any legitimate reason for scheduling an early flight and then aborting the deposition without the court's permission. Although traveling from Florida to Wisconsin for a two-day deposition was certainly inconvenient for Eivaz, inconvenience does not justify his actions. Red Dot's attorney had flown 800 miles from New York to conduct the deposition, after having taken the unusual precaution of obtaining a court order granting him leave to take an extended deposition. He did so for the express purpose of avoiding just such an interruption and the need to seek court approval and make arrangements for a continuation of the deposition later. Under these circumstances, Eivaz's early departure was a blatant violation of the court's November 21, 2013 discovery order.

## C. Appropriate Sanctions

Red Dot contends that Eivaz's claims against it should be dismissed because he has engaged in a "pattern of contumacious conduct" which has prejudiced Red Dot's ability to gather evidence and defend against his claims. Red Dot also argues that Eivaz's violation of the court's November 21 2013 order was willful and in bad faith. In addition, Red Dot and Edwards both argue that Eivaz would have an unfair advantage at a continued deposition because he would have advance knowledge of Red Dot's questions, the documents Red Dot intends to use, and Red Dot's defenses and theories of the case. Edwards characterizes Eivaz as a "highly intelligent, commercially savvy, argumentative, extremely sophisticated litigant," a characterization the deposition confirms. If ordered simply to complete his deposition, counsel fear he will attempt to modify or supplement his previous answers even if he is not directly asked the same questions again.

The court agrees and concludes that dismissal of Eivaz's claim is justified. In reaching this conclusion, the court has considered the severity of Eivaz's discovery violations as well as the

prejudice to the defendants. Eivaz's violation of the court's order was willful and in bad faith. This much is clear not only from the conduct of Eivaz itself, but also in his response to Red Dot's motion for sanctions. Eivaz has misrepresented the facts surrounding the aborted deposition and the reasons for his abrupt termination. As already noted, the fact that he scheduled his departure for noon on December 17 demonstrates he had no intention to comply with the court's order granting Red Dot leave to take an extended deposition. His belated argument that counsel for Red Dot was wasting time is belied by the record in which there is no evidence that counsel for Red Dot was harassing or in any way abusing the authority the court had granted him to conduct an extended deposition.

The seriousness of the violation is compounded by Eivaz's response to Red Dot's motion for sanctions. Despite the clear violation of the court's order, Eivaz accuses counsel for Red Dot of filing "a baseless motion for sanctions, hoping to force Mr. Eivaz to incur unnecessary costs to respond to the motion was a waste of both parties' resources." (Eivaz Resp. at 3, ECF No. 58.) He claims "Red Dot's request for sanctions and dismissal is beyond the pale," and accuses Red Dot of mounting a "personal attack on Mr. Eivaz and his counsel [that] is so unfounded and off-base that it borders on harassment." (*Id.* at 2–3.) Rather than admit that he violated the court's order and agreeing to make amends, Eivaz has mounted a defense that misrepresents the facts and evidence and only adds to the expenses of opposing counsel and the work of the court. Red Dot's submissions on the issue alone exceed 650 pages, including deposition transcripts, pleadings, discovery responses, declarations of counsel, and various other exhibits. As Red Dot contends, Eivaz's response to the motion only compounds the violation and provides further evidence of his bad faith and willfulness.

Given that Eivaz's e-mail production was minimal, his reluctance to search for and produce relevant financial documents, and sit for a complete deposition is inexcusable. Eivaz characterized

Red Dot's discovery request as a "fishing expedition," but he did not place such an objection on the record prior to or during the November 21 hearing. (Eivaz Dep. I at 59:14–25, ECF No. 51-10.) Moreover, he left the deposition just as Red Dot's attorney was moving to the key questions concerning the formation of the alleged agreement with Red Dot. Red Dot's attorney had yet to ask him in detail about the work he allegedly performed for Red Dot as a member of its Advisory Council. To walk out in the middle of a deposition absent a court order would be sanctionable. To do so in spite of a court order warrants a substantially greater sanction. Eivas should not be allowed to reap whatever strategic advantage he hoped to gain by interrupting his deposition in blatant violation of the court's order. Nor should Red Dot be forced to incur additional fees and delay in reaching a resolution of the substantial claim made against it. Accordingly, Eivaz's claims against both of the defendants are dismissed on their merits and with prejudice.

There remains Red Dot's counterclaim against Eivaz and its cross claim against Edwards. If Red Dot elects to pursue those claims, it is entitled to continue its deposition of Eivaz, and it may do so at expense of Eivaz and his attorney who advised Eivaz to leave. Accordingly, Eivas and his attorney are directed to pay Red Dot's additional attorneys fees and costs, including expenses for travel and lodging, incurred in continuing his deposition. They are also ordered to pay Red Dot's expenses, including attorney's fees, in bringing this motion. Although Red Dot has also asked for payment of its fees in bringing its previous motion to compel, the court is satisfied that this sanction is sufficient.

## III. CONCLUSION

Eivaz's motion for sanctions (ECF No. 49) and Edwards' conjoined motion to dismiss (ECF No. 54.) are granted. Eivaz's claims against both defendants are dismissed with prejudice. In the event that Red Dot elects to pursue its claim against Eivaz and/or Edwards, Eivaz is further ordered to submit to a continued deposition with Red Dot, for up to 7 additional hours. Again, there is to be no wasting of time, abuse or harassment, and if available, the court will assist the parties in resolving any disputes that arise. Eivaz and his attorney are also ordered to pay attorneys fees and expenses incurred by Red Dot in continuing the deposition, as well as Red Dot's attorneys fees and expenses incurred in bringing its motion for sanctions. In addition, Eivaz's motion for leave to file a sur-reply (ECF No. 70) is granted, and the clerk is directed to file the attached declaration. The Clerk is directed to set this matter on the court's calendar for a conference call within the next two weeks to discuss the status of the case and the need to modify the discovery and dispositive motion deadlines.

**SO ORDERED** this ___19___ day of September, 2014.

_s/ William C. Griesbach_
William C. Griesbach, Chief Judge
United States District Court