UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RAMIN EIVAZ,

       Plaintiff,

v.                                               Case No. 12-C-910

MARK JONATHAN EDWARDS, et al,

       Defendants.

**DECISION AND ORDER**

      This case was dismissed in September 2014 based upon this court's ruling that the Plaintiff's conduct during the discovery process—failing to produce documents and leaving a deposition before it was finished—was unreasonable. On January 5, 2015, this court granted the Plaintiff's motion for reconsideration. In the January reconsideration order, I concluded that although Eivaz and his attorney acted improperly by terminating a deposition early and by failing to comply with discovery requests, dismissal was too harsh of a sanction. I reinstated the action but approved an award of attorney's fees of some $117,000. In that order, I also noted that any further discovery violations would be grounds for dismissal. (ECF No. 98 at 11.) Unfortunately, that was not the end of the matter. The Defendants have now filed a second motion for sanctions, which is based on Eivaz' alleged duplicity and continued pattern of obstructive conduct. For the reasons given below, the motion will be granted and the case will be dismissed.

      In 2013 Red Dot requested production of all documents relating to Plaintiff's claim that he was entitled to more than a million dollars in compensation. Plaintiff responded by producing only

31 pages of documents, explaining that emails from the relevant period (2007-09) were lost due to two computer crashes he sustained. Plaintiff protested that he had conducted an exhaustive search for any other responsive documents, and testified in a deposition that his email hosting provider, ReadyHosting, only kept his emails for 30 days. This meant that there was no way to recover emails from the 2007-09 time period.

The Defendants, in their initial motion for sanctions, argued that the computer crash issue was concocted by Eivaz, and, in a September 19, 2014 order granting the Defendants' motion for sanctions, I concluded that their concerns were "not unfounded" but that there was not clear and convincing evidence that Eivaz had lied. (ECF No. 74 at 14-18.) I also noted that Eivaz had offered to cooperate in the production of emails from ReadyHosting.

Red Dot soon issued discovery requests to ReadyHosting, but Plaintiff found the requests overbroad and moved to quash the subpoena in the District of Massachusetts. Red Dot argues that if ReadyHosting truly did not have any of Plaintiff's emails, as Eivaz had earlier claimed, then an "overbroad" subpoena would not make any difference. That is, Eivaz was essentially moving to quash a subpoena for emails he had earlier said didn't exist, a complete about-face.

Red Dot argues that by admitting that the emails *do* exist on the ReadyHosting server, Plaintiff was also conceding that he was wilfully refusing to produce those emails. Regardless of whether Red Dot's own subpoena was overly broad, Plaintiff himself could have arranged with ReadyHosting to obtain emails responsive to its 2013 discovery request. Instead, he and his attorneys litigated the motion to quash (which was granted on the grounds of overbreadth) instead of turning over responsive documents. Failing to produce the documents is sanctionable, Red Dot argues, because this court already ordered production of the documents in November 2013 (more

2

than two years ago), and because Eivaz assured the court that he would cooperate in producing them. It is also sanctionable because Eivaz, who has a background in computers, has made a 180-degree turn with his story. While earlier he argued that the documents did not even exist (an argument founded upon the questionable theory that two computer crashes had destroyed them), now he argues that they *do* exist but that he is unwilling to agree to let his provider respond to the subpoena. In short, Red Dot's motion is founded both on Eivaz' untruthfulness and his unwillingness to cooperate in turning over responsive documents.

I will focus on Eivaz' alleged untruthfulness, which is a more serious allegation. Recall that Eivaz' explanation for the absence of his emails was two-fold. First, he stated that he sustained two separate computer crashes during the relevant time period, and those events accounted for the loss of all of his emails during the relevant period. Normally, a crash on one's personal computer would not destroy emails because emails are typically stored on a third-party hosting site. Thus, the second pillar of Eivaz' explanation was that ReadyHosting.com, the third-party host, kept his emails for just thirty days. He explained in a December 2013 deposition that because he had no need for storage of emails longer than thirty days, he signed up only for the company's "basic service offering." "If you have a business," he explained, or "for some reason you need additional services, you could pay more and maintain – have them maintain stuff for you longer. In my case, I didn't have to. I didn't want to pay more, so I have their basic service offering, which is about a hundred bucks a year or something." (ECF No. 51-10 at 52.)

The Defendants challenged this explanation. First, in the abstract, it would be highly unusual for emails to be automatically deleted within 30 days. Storage of emails is not particularly costly, and it is not hard to imagine the customer complaints and chaos that would ensue if every

3

user's emails simply got wiped away after a mere thirty days. It is commonly known that even free email sites such as Yahoo! or Gmail allow emails to be stored as long as there is room in the customer's account—sometimes for decades. In short, a thirty-day deletion protocol seemed unusual.

Second, the Defendants contacted ReadyHosting and even set up a ReadyHosting account of their own. Based on their experience, the basic service package allows the capacity for 10,000 emails, without any provision that emails are deleted after a certain period of time (much less after only thirty days). A ReadyHosting customer service employee also explained that the company has never offered a "basic service package" that would automatically delete emails after thirty days. (ECF No. 52, ¶¶ 3-4.)

Third, the Defendants noted that two emails Eivaz did produce, which were from October 2007, had date stamps of 1/15/2012 on them, suggesting that Eivaz (or someone else) had printed them out in 2012. It follows that if the emails were retrievable in 2012, then certainly the emails had not been deleted within 30 days, as Eivaz claimed.

Although there was much "force" to Red Dot's evidence, I was reluctant to conclude that Eivaz had lied. (ECF No. 74 at 17.) Giving Eivaz the benefit of the doubt, I relied on the possibility, as Eivaz himself suggested, that if he used a program such as Microsoft Outlook on his own computer, he could have set that program to delete the emails on the ReadyHosting server once they had been downloaded to his computer. I further noted that there was no evidence that ReadyHosting had confirmed that the emails actually existed.

Based on the entirety of the record now before me, however, I am able to conclude that Eivaz' explanation for the missing emails is untrue. First, it is now evident that Eivaz' Microsoft

4

Outlook theory is wholly inconsistent with his own, earlier, testimony. Recall that his deposition testimony was that ReadyHosting deleted his emails after thirty days because he had signed up only for the "basic" package. (ECF No. 51-10 at 52.) As an individual, he'd explained, he had no need for more storage and thus declined to pay extra for it. (*Id.*) This explanation was not an off-handed remark speculating about why the emails were gone. Instead, it was a clear statement that they were gone *by design,* i.e., because he was unwilling to pay the hosting company extra money to keep them longer. He said he signed up only for the "basic service package," which deleted emails after 30 days.

A few months later, in response to the Defendants' evidence that ReadyHosting allowed for up to 10,000 emails to be stored indefinitely, Eivaz changed his mind and theorized that his emails might have been deleted due to a setting on Microsoft Outlook, which could have caused the emails to be deleted on ReadyHosting's server. He stated, in an un-notarized affidavit: "The variety of settings available in Outlook for archiving and deleting make it possible that an email could have been archived or deleted after 30 days. If archived, it would have been stored on the computer and not with ReadyHosting.com. If the computer crashes and is no longer usable, the emails are gone as well. I know that, due to space limitations, I did have some sort of archiving setting in place with Microsoft Outlook." (ECF No. 58, ¶ 19.)

This latter explanation is fundamentally at odds with his earlier and unambiguous testimony from only a few months earlier that he intentionally signed up for an account at ReadyHosting knowing that the *host* would be automatically deleting his emails. Deletion after thirty days, he said, was part of the bare-bones plan he signed up for. It was only when the Defendants exposed the fact that ReadyHosting did *not* delete emails after thirty days that Eivaz pivoted 180 degrees

5

and then claimed that the deletion must have been due to a setting on his own computer's Outlook program. But because that explanation contradicts his deposition of only a few months earlier, it should not be afforded much, if any, credence. What's clear is that *at least* one of the two theories is false.

The fact that Eivaz' novel Outlook theory was contained in an un-notarized affidavit is also troubling. First, it is doubtful that the court should have considered the evidence at all. An affidavit that is not notarized is not an affidavit. Black's Law Dictionary 58 (6th ed. 1990) (defining an affidavit as a written declaration "taken before a person having authority to administer such oath or affirmation.") Federal courts are not so strict. In federal court, 28 U.S.C. § 1746 allows parties to rely on *unsworn* declarations, but such declarations must state that "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." 28 U.S.C. § 1746. Eivaz' February 2014 "affidavit" conspicuously lacks such a statement. Instead, it is simply signed with an electronic signature "/s Ramin Eivaz," lacking any indication that the signatory acknowledges the penalty of perjury. Accordingly, Eivaz' novel theory that Microsoft Outlook was to blame for his missing emails was not properly supported evidence under Fed. R. Civ. P. 56(e). *DeBruyne v. Equitable Life Assur. Soc. of U.S.,* 920 F.2d 457, 471 (7th Cir. 1990) (the "affidavit was not notarized at the time of filing. Moreover, the supplemental affidavit was unable to invoke 28 U.S.C. § 1746 . . . As such, the 'affidavit,' which did not subject Hanan to the penalties for perjury, was not within the range of evidence that the district court could consider."); *Gilty v. Vill. of Oak Park,* 919 F.2d 1247, 1255 (7th Cir. 1990) ("these affidavits were neither notarized nor made under the penalty of perjury and, therefore, did not comply with rule 56(e) of the Federal Rules of Civil Procedure. As such, we can simply ignore them."); *Ghazi v. Fiserv, Inc.,*

904 F. Supp. 823, 827 (N.D. Ill. 1995) ("In this case, these affidavits do not comply with the requirements of § 1746 because neither affiant states that he or she declares the contents of the affidavit to be true under the penalty of perjury.")

Also troubling is the fact that Eivaz was clearly no stranger to the requirements of affidavits. In a November 2013 affidavit, just three months prior to the un-notarized February 2014 "affidavit," Eivaz properly obtained a notary's signature and stamp when he filed his affidavit. (ECF No. 44-7.) And then in October 2014, several months later, he once again had his affidavit properly sworn and notarized. (ECF No. 86). Yet, in-between those two filings, for some reason he failed to obtain a notarization swearing that the facts alleged in his filings were true. Of course, I am unable to reliably speculate as to whether he simply forgot on that one occasion, or whether he deliberately declined to swear, under penalty of perjury, that his Outlook settings had played a role in the deletion of his emails. Yet the fact that he advanced such an assertion only in an unsworn affidavit is another factor consistent with Red Dot's firm belief that Eivaz has been manufacturing false reasons to avoid disclosure of relevant emails.

We now know that ReadyHosting did not delete the emails after 30 days, and they apparently never had such a policy. Not surprisingly, there was no such thing as a "basic" service package that automatically deleted emails after such a short time period. Eivaz' testimony to the contrary does not appear to be a mistake, but a deliberate effort to concoct a reason the emails were not being provided. It was not as though he forgot something, or misspoke, or got a date mixed up. His explanation was not an offhanded remark or a "maybe" but a calculated, reasoned and deliberate explanation based, he said, on his lack of any need to keep emails longer than 30 days and his unwillingness to pay more to have that feature. In short, on its own, the deposition

7

testimony reflects a deliberate effort to mislead. The fact that he changed stories only a few months later, adopting the Microsoft Outlook theory in an unsworn affidavit, only makes the original explanation even less convincing.

All of the above was known to the court during the consideration of the original motion for sanctions. In an abundance of caution, I declined to base an imposition of sanctions on the falsity of these explanations, implausible as they seemed. Since then, however, additional factors convince me that any sanction short of dismissal would be insufficient. In particular, Eivaz' own recent declaration actually confirms the infirmity of his story and evidences a continued effort to deceive. In his declaration, he states that when the documents were initially requested in May 2013, he contacted ReadyHosting to see if he could get his deleted emails.[1] (ECF No. 114 at ¶ 2.) According to his declaration, ReadyHosting told him "that ReadyHosting only maintains e-mails for whatever period of time the customer retains them, so if the customer's settings automatically delete e-mails after 30 days, which is fairly typical, ReadyHosting only maintains them for that same period of time." (*Id*.) Once again, this is an iteration of the Microsoft Outlook theory, i.e., the idea that the user's settings on his own computer's email reader automatically deleted the email (as opposed to the ReadyHosting deleting them automatically after thirty days). In other words, if the customer deletes the email *himself*, the provider does not maintain those emails.

The problem with Eivaz' recent declaration is that it claims ReadyHosting told him, *in 2013,* that his own email settings might be to blame for the lost emails. (*Id.*) The timing does not

---

[1] The declaration does not give an exact date, but the context indicates it would have been in May 2013 or soon thereafter. "After receiving a request for production of documents from the defendant, Red Dot Square Solutions, dated May 14, 2013, I did two things. . . .Second, I contacted my e-mail service provider (ReadyHosting) . . ."

8

make sense. If Eivaz had truly thought his own email "settings" were to blame, then why did he testify on December 16, 2013—long after the discovery requests that prompted his alleged question to ReadyHosting—that the emails were deleted because ReadyHosting *itself* only kept the emails "up to 30 days" pursuant to his "basic" service package? (ECF No. 51-10 at 52.) If he had known otherwise, he would not have had to invent the concept of the basic service package during his deposition—he would have blamed his own Microsoft Outlook "settings" for deleting the emails.

The importance of this is that it demonstrates not only that Eivaz' story has changed dramatically, but that he has doubled-down on the deception by attempting, anachronistically, to bolster his newer argument blaming his Outlook settings. Given his December 2013 testimony explicitly blaming ReadyHosting's "up to 30 days" policy for keeping emails, rather than anything having to do with his own settings, the only reasonable conclusion is that the August 2015 declaration is untrue, i.e., that he did *not* hear from ReadyHosting in May 2013 or soon after that his settings could be to blame. As Red Dot notes, the Microsoft Outlook deletion theory did not surface until 2014, in response to the strong evidence that his "basic" service testimony was absurd. Eivaz' recent effort to suggest he learned about it back in 2013 only compounds the problem.

Eivaz and / or his counsel appear to recognize this problem, and their solution appears to be an effort to rewrite history. In the same August 2015 declaration, Eivaz remarkably asserts that he "never testified that no e-mails exist at ReadyHosting because of a 30-day deletion provision in my contract with it. Nor would I testify to that, since I have no idea what e-mails exist, if any, on ReadyHosting's server other than what ReadyHosting has told me and what is located on ReadyHosting's website." (ECF No. 114 at ¶ 4.) Of course the essence of this most recent statement is fundamentally untrue. In his deposition, he was asked whether ReadyHosting stores

9

emails for him, and he responded by saying "Up to 30 days." (ECF No. 51-10 at 52:12.) The plain implication of "up to 30 days" is that emails are *not* stored longer than that. In other words, they are automatically deleted. In the deposition, Defendants' counsel was not asking the question out of idle curiosity, he was wondering why the emails (allegedly) no longer existed. And Eivaz' response was that his host company only stored them for 30 days, and his own computers, which might have backed them up, had crashed. (*Id.* at 52-53.)

> Q. And ReadyHosting retains e-mails for you, does it not? Stores them?
>
> A. Up to 30 days.
>
> Q. Do they not – do they not store up to 10,000 email messages?
>
> A. Not for me.
>
> Q. Did you make special arrangements with them to only keep yours for 30 days?
>
> A. No. There are different service providers. So if you have a business, for some reason you need additional services, you could pay more and maintain stuff for you longer. In my case, I didn't have to. I didn't want to pay more, so I have their basic service offering, which is about a hundred bucks a year or something.

(*Id.* at 52:10-25.)

Taken in its proper context, the essence of Eivaz' testimony was that he believed the emails were lost because they were automatically deleted, after 30 days, pursuant to the "basic" service he had with ReadyHosting. They would have maintained the emails for longer, but "I didn't have to. I didn't want to pay more." (*Id.*) The emails were lost, therefore, because of ReadyHosting's policy of keeping them for only 30 days—something Eivaz was at pains to explain he was perfectly fine with. The present declaration to the contrary appears to be nothing short of an attempt to rewrite history, to scrub away the now-debunked "basic service offering" theory.

10

In sum, Eivaz' ever-changing story asks too much indulgence of the court and the Defendants. The evidence is now overwhelming that Eivaz' December 2013 deposition testimony blaming ReadyHosting for only keeping his emails "up to 30 days" was false. It made very little sense at the time, and Eivaz quickly changed his story when confronted with the assertion that ReadyHosting never offered such accounts. In addition, his August 2015 declaration suggesting that he learned from ReadyHosting, in 2013, that his own email settings could be responsible is also false, because it is fundamentally inconsistent with the deposition testimony he gave in December 2013. Both of these statements were not just errors or misstatements, but deliberate explanations designed to explain away the very unusual contention that a third-party email server would not have a customer's emails stored on it. Finally, his effort to claim that he never blamed ReadyHosting's 30-day retention policy for the loss of his emails is at odds with his clear testimony.

But that is not all. Even if, for some reason, we were inclined to look past the original fabrication blaming the "basic service offering" for keeping the emails only 30 days, we must remember that the more recent theory blaming the loss of emails on Eivaz' Outlook settings does not stand on its own. Instead, that theory explains the loss of emails only if we *also* believe that Eivaz suffered not one but two computer crashes *and* that these crashes were so catastrophic that they not only crippled his operating system but also destroyed the data on his hard drive. That sequence of events is too implausible.

I agree with Red Dot that the evidence of continued deception is now overwhelming, and Eivaz has not squarely addressed these glaring inconsistencies in either of his briefs. Silence in the face of such serious allegations speaks volumes. For these reasons, I conclude the sanction of

11

dismissal is warranted.

The motion for sanctions is **GRANTED** and the action is **DISMISSED** with prejudice.[2] The motion to dismiss and motion for summary judgment are **DENIED** as moot, as is the motion for leave to file an additional brief. The clerk will enter judgment accordingly.

**SO ORDERED** this 13th day of September, 2016.

                                              /s William C. Griesbach
                                              William C. Griesbach, Chief Judge
                                              United States District Court

---

[2]Some attorney's fees were awarded as a sanction on March 10, 2015. I am satisfied that the sanction of dismissal, being a very serious sanction, suffices to dispense with this action without the sanction of additional attorney's fees.